UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 20-193(1) (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL ROBERT SOLOMON,<br><br>Defendant. | GOVERNMENT'S POSITION<br>ON SENTENCING |

_____

"If we are able to accomplish our goals, the U.S. would be f*****g done." – *Defendant Michael Solomon –recorded on June 28, 2020.*

_____

The United States of America, through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Assistant United States Attorney Andrew R. Winter, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, § 3553(a), the United States believes that a sentence of 240 months' imprisonment, followed by a lifetime of supervised release, is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.      INTRODUCTION

On May 4, 2021, Defendant Michael Solomon ("Defendant") pled guilty to Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1). Presentence Report ("PSR"), ¶ 3. Defendant's

guideline range is 360 months to life, however the statutorily authorized maximum sentence is 240 months. PSR, ¶ 95. The government believes an examination of the factors set forth in 18 USC Section 3553(a) leads to the conclusion that 240 months is a fair and appropriate sentence in this case.

## II.    FACTS OF THE CASE

Defendant pleaded guilty to conspiring to provide material support to Hamas. Defendant, along with his co-conspirator Benjamin Ryan Teeter ("Teeter"), sought an alliance with a foreign terrorist organization with the goal of financing their domestic anarchist group, the "Boogaloo Bois." Throughout the summer of 2020, both Defendants voiced their desire to grow their anti-government organization, to engage violently with police, and to destroy legitimate forms of government in the United States. Defendant and Teeter then supplied homemade firearms suppressors and 3D-printed auto-sears[1] to persons they believed were members of Hamas with the understanding that the devices would be used to kill American service members overseas.

### A. Background

Prior to the murder of George Floyd on May 26, 2020,[2] Defendant and Teeter were members of the Boogaloo Bois – a loosely-organized, anti-government, pro-gun, and extremist political movement in the United States. Boogaloo adherents say they are preparing for, or seek to incite, a second American Civil War, which they call the

---

[1] An "auto sear" is a device designed to convert a semi-automatic rifle into a fully-automatic weapon.
[2] All dates referenced below occurred in 2020.

2

'Boogaloo.' The Boogaloo movement organizes primarily online and its participants have appeared at in-person events, including the 2020 United States anti-lockdown protests and the protests taking place in the aftermath of the murder of George Floyd. Heavily armed, Boogaloo members are often identified by their attire of Hawaiian shirts and tactical clothing. Defendant himself joined this anti-government movement online and acknowledges adopting the Boogaloo Bois' extremist ideology as a remedy to what he perceived as the societal ills in the United States. PSR, ¶ 35.

### B. "Lock and load boys – Boog flags are in the air…"

One day after George Floyd's murder, Defendant reached out to the Boogaloo Bois community on Facebook with a call to action: *"I need a headcount. If you're (sic) you have keybase[3] message me on there 'bigboogboi' if not [private message] me."* PSR, ¶ 10. That same day, Teeter – a resident of North Carolina – posted on his Facebook account, *"Lock and load boys. Boog flags are in the air, and the national network is going off.*" *Id.* Teeter then traveled to Minnesota to meet Defendant and the other Boogaloo Bois, bent on capitalizing on the civil unrest. Teeter would later explain in a media interview, *"if the police start shooting, we're gonna shoot back.*" PSR, ¶ 27.

Within hours of reaching the Twin Cities, Teeter joined Defendant at the epicenter of the unfolding chaos. As the Minneapolis Police Department's Third Precinct building

---

[3] "Keybase" is a secure messaging and file sharing service that utilizes end-to-end encryption.

burned nearby, Defendant, Teeter, and their fellow Boogaloo Bois – all armed with rifles – posed for a photograph[4] in front of the freshly-looted Cub Foods store:



During the civil unrest in the Twin Cities, Defendant and Teeter portrayed themselves to media outlets as protectors.[5]  However, their private conversations revealed far more dangerous goals. Indeed, within days of Defendant's rendezvous with Teeter, their talk of violent anarchy was brought to the attention of law enforcement when a concerned

---

[4] On June 6, Defendant posted this image on his Facebook page titled "Mike Soloboog." In the photograph, Defendant appears third from the left and Teeter is third from the right. That same day, as he loaded ammunition into a firearm, Defendant told the CHS "*most likely, shit we're doing we don't want our fingerprints on our shit*." CHS recording from June 6.

[5] In an interview with the United Kingdom's Daily Mail, Defendant stated, *"[o]ur whole thing is, we believe in freedom and absolute liberty for everyone regardless of race, creed, sex, gender, whatever; we don't care*." PSR, ¶ 28. When Teeter spoke to CNN, he claimed his mission in Minneapolis was to protect protesters and that *"[w]e're just a group that believes in ultimate, personal freedoms, as long as you're not hurting anybody else…"*. PSR, ¶ 24.

4

citizen reported that both were openly discussing their desire to overthrow the government and commit acts of violence against law enforcement.[6] PSR, ¶ 11.

Simultaneously, a confidential human source ("CHS") had identified Defendant and Teeter as persons of concern. By June 6, Defendant had invited the CHS to meet with him and other Boogaloo Bois in person. PSR, ¶ 12. The CHS' ethnicity, accent, and knowledge of the conflict in Palestine led Defendant and Teeter to conclude that the CHS was a member of Hamas.[7] Defendant and Teeter immediately began to market themselves and the Boogaloo Bois organization to Hamas with the aim of obtaining funding for their growing group of armed extremists. Defendant insisted, "*to you and your friends, we've got to be pretty valuable because [we are] two American-born white boys, right? We can move around like nothing. I can take anything anywhere*." Defendant would later urge the CHS, "*we need an investment in this partnership*."  PSR, ¶ 15.

---

[6] At one point, Teeter told a witness that he had a connection within the National Guard who would support the Boogaloo Bois if a siege occurred. A recorded conversation a short time later further confirmed their true intentions. Unaware that he was being recorded, Defendant explained, "*[i]f we get to the point where we engage the police, [UI]. I'm not going to stop...I'm going to take out whoever initiated the violence, and then I'm going to hang out in the area,...move and set up in a better location...and then I'm going to take out the next thing that shows up. And I'm going to keep going until I'm not taking out people anymore. [I]f I get into a firefight, I'm getting into a firefight until I can't fight anymore. If I run out of ammo, I'll go to court.*" In this same conversation, Teeter stated, "*[t]his is mercenary protocol...If I have to shoot someone I'm not going to call the cops and stick around.*" CHS recording from June 6.

[7] After discussing the fact that the Boogaloo Bois' views aligned with "freedom fighter groups," the CHS asked Defendant and Teeter what organization they thought he was affiliated with. Defendant responded, "*[m]y guess would be starts with an "H," just from how you talk about Palestine...So it starts with an "H".*" CHS recording from June 8.

## C.  Defendants seek to "make a statement"

As an entrée to this new partnership, Defendant and Teeter proposed blowing up a historic courthouse. Conceived as a "statement" to benefit both the Boogaloo Bois and Hamas, the numerous discussions surrounding the plot were explicit. On one occasion, Teeter stated, "I'm working on calculating the exact amounts of the explosive stuff needed for [the destruction of a courthouse], but I'm ready to go… I should be able to pull up schematics on the courthouse pretty easily and figure out the exact size." Though Defendant was not present for some of these discussions, he reassured the CHS that "*we're [Defendant and Teeter] kind of the same entity, right? So if one of us isn't there…I think you'd agree that I can speak for [Teeter]…and if I'm not there, he can speak for me…We're on the same page.*" PSR, ¶ 15. While Defendant and Teeter talked about murdering politicians and journalists[8] as another way of making a statement, the plot to destroy a courthouse would later be replaced by Defendant's and Teeter's scheme to supply weaponry to Hamas.[9]

---

[8] On June 28, Defendant told the CHS, *"[w]ell, for the future, I'd build a gallows in front of the…Congress building in D.C. and just start hanging politicians left and right*." On August 12, both Defendant and Teeter discussed the murder of U.S. senators during a recorded conversation with the CHS.  Defendant stated, "*I want to, like, take down twenty senators while they're playing fucking baseball, right?...I don't want to blow up a courthouse.  I want to murder a bunch of U.S. politicians. That's the statement I want to make.*"

[9] On August 6, Defendants explained their rationale for putting off the plot to blow up a courthouse. Defendants stated they instead preferred to execute a larger plot. As an example of such a larger plot, Defendants suggested the murder of U.S. senators.

### D.  Defendants build and supply suppressors to Hamas

On June 28, the CHS introduced Defendant and Teeter to an FBI employee posing as a more senior member of Hamas. PSR, ¶ 15. During this meeting, Defendant and Teeter continued to market themselves as valuable assets to the terrorist organization. Defendant told the men, "*…we have a lot of things that we can do…we can move around really freely and…unnoticed. We have…a lot of training and a lot of knowledge. But I'm also a redneck, nobody notices a redneck. But basically, we've got the ideas, we've got…training and we've got knowledge.*" Teeter added, "*and we have a network.*"  Defendant and Teeter also spoke glowingly of their ability to arm Hamas, insisting they could "*purchase any guns we want,*" "*create unregistered and untraceable weapons,*" and to "*make 'em fully automatic if you'd like.*" Teeter also pitched, "*we have Boog Bois across the country who we could use as a network to move [weapons] around. It's definitely something we'd be capable of.*"

Defendant and Teeter then purchased a drill press from a local hardware store and obtained the remaining parts necessary to build suppressors from an online source. After setting up the tools in Defendant's garage, they manufactured the first batch of suppressors and presented the five devices to the CHS on July 17. At that time, both Defendant and Teeter were explicitly told that the devices would be "combat-tested" by the militant wing of Hamas. PSR, ¶ 17. Furthermore, when the suppressors were later delivered to the CHS and his "boss"[10] Defendant and Teeter explained in detail how the devices would assist Hamas members in combat by reducing noise and muzzle flash. This, Defendants

---

[10] This individual was an FBI undercover employee (UCE) introduced to Defendant Teeter by the CHS and presented as a more senior member of Hamas.

explained, would allow Hamas fighters to attack more effectively from concealed positions. PSR, ¶ 18.

Removing any doubt about the end-use of their devices, Defendants were shown a video in which their suppressors were portrayed as being used by overseas members of Hamas. PSR, ¶ 19. Pleased with the images in the video, Defendant and Teeter turned the discussion to expanding the partnership with Hamas. To that end, the Defendant and Teeter proposed opening a business as a front to a suppressor-manufacturing operation supplying both Boogaloo Bois and the terrorist organization.[11] Defendant suggested a sham maintenance shop as the "*perfect cover*" because – unlike a tobacco shop – there would be no government oversight and, thus, less chance that the illicit nature of their business would be uncovered by law enforcement. *Id.* Both Defendants were prepared, however, to offer the terrorist organization a "*steep discount*" on their products. *Id.*

### E.  Defendants supply auto-sears to Hamas

After boasting early on about their ability to make fully automatic weapons (PSR, ¶16), Defendants delivered. Through a website maintained by a Boogaloo Bois contact,[12] Defendant and Teeter ordered a number of 3D-printed auto-sears, then brought one to the August 29 meeting for a demonstration with the CHS and UCE.  Frustrated that the device

---

[11]Early on in this conspiracy, Defendant assured the CHS that he would conceal Hamas' involvement in the suppressor-manufacturing project. On June 17, he told the CHS "*If we decided to make a bunch of these…with other guys from our movement…we wouldn't even mention you guys. It would just be like 'we're making these'.*"

[12] In reference to the website selling the auto-sears, Teeter explained "*[i]t's a Boog Bois who runs this, right. So he's… knows exactly what he's selling. He knows who's buying and he's okay with that.*" CHS recording from August 29.

didn't seat properly in a rifle, Defendant assured his new partners that he had another five devices on order. PSR, ¶ 20.[13]   Teeter added, "*I will be so excited to produce [auto sears] in-house instead of having to deal with other people....*" Teeter advised his partners to first use an auto-sear in combat: "*I would say use one for the first time for combat and then just for training maybe after that until you know how long they last*." The CHS told Defendants it would be sufficient if the auto-sears worked long enough to "*kill 2-3 American soldiers, 2-3 Israeli soldiers,*" to which Defendant replied, "*yeah*." As the four men wrapped up this meeting, the CHS asked for a lighter. Teeter offered his stating, *"[i]t's the first rule of [UI] a domestic terrorist - always have a way to light something on fire."*

### F. Defendants arrested; residences searched

On September 3, Defendant and Teeter drove to a park to meet with the CHS.  Both men believed they were going to spend the afternoon looking for rental property for their suppressor-manufacturing operation. Defendant, armed with a 9mm handgun, and Teeter, carrying a .25 caliber handgun, walked unsuspectingly to the meet location where they were arrested by FBI agents. From Defendant's truck, agents recovered Boogaloo patches and coffee mugs, a pair of handcuffs, a magazine for an AK-47, and 60 rounds of 5.56 rifle ammunition. Agents also searched his home in New Brighton where they recovered three loaded assault rifles,[14] a Boojahideen t-shirt, a Boogaloo flag, a .44 revolver, a tactical vest

---

[13] Defendant had ordered five (5) additional auto sears from *Wallhangers.com*. Agents obtained a search warrant for a parcel addressed to Solomon's house and recovered the devices contemporaneous to his arrest.

[14] One of these assault rifles – an AK-47 – was confirmed through testing to have been used by a fellow Boogaloo Bois, Ivan Hunter, to shoot into the Third Precinct building on

with plates, a ballistic helmet, multiple separate loaded rifle magazines, a package for a drop-in auto sear, plus equipment for manufacturing suppressors. The FBI also intercepted two parcels addressed to Defendant. One contained five (5) auto-sears and the other five (5) more solvent traps to make additional suppressors. In Teeter's hotel room, agents recovered five loaded rifle magazines, a tactical vest, an AR-15 assault rifle, loaded pistol magazines, bear spray, machine tooling notes, a handheld radio, a Buck knife, a tactical knife, a gun diagram, a baton, and a gas mask.

### III.    THE REPORT OF PRESENTENCE INVESTIGATION

The United States has no objections to the factual assertions in the PSR.  The PSR calculates a base offense level of 26 for Count 1. PSR, ¶ 38. The parties agree that the terrorism adjustment of U.S.S.G. § 3A1.4 applies to the count of conviction, resulting in a 12-level increase in offense level and a criminal history of Category VI. PSR, ¶ 4. The PSR also concluded that a two-level increase applies because the offense also involved the provision of dangerous weapons, firearms, or explosives; or other material support or resources with the intent that they would be used to commit or assist in the commission of a violent act.[15] *See* U.S.S.G. § 2M5.3(b)(1); PSR, ¶ 39. To date, Defendant has earned a three-level reduction for promptly pleading guilty and accepting responsibility for his crimes. PSR, ¶¶ 34-36. The resulting range of 360 months to life exceeds the statutory

---

the night of May 28, 2020. Hunter has been indicted separately for this conduct. *See United States v. Ivan Harrison Hunter*, 20-cr-250 (MJD/ECW).

[15] Teeter has objected to the application of this enhancement. The government notes that the facts supporting this enhancement were admitted as part of his guilty plea. Whether or not the Court applies § 2M5.3(b)(1), the guidelines remain 240 months.

maximum sentence of 240 months for a violation of 18 U.S.C. § 2339B. As such, the guidelines range is fixed at 240 months. PSR, ¶ 95.

## IV.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).

### A.   Nature and Circumstances of the Offense

That his extremist ideology would serve to knowingly facilitate the deaths of U.S. citizens overseas is indeed cause for a lengthy sentence in this case. Defendant was wholly undeterred by his full understanding that the suppressors and auto-sears he and Teeter supplied were to be used on the battlefield against his fellow citizens. Further, the lengths to which Defendant went to support a foreign terrorist organization – all with the aim of

11

financing and expanding a violent domestic extremist organization – is truly disturbing. Though presented with multiple opportunities to take a different path, Defendant eagerly persisted in the planning and execution of a plot to supply weaponry to what he believed was a foreign terrorist organization.

**B.      History and Characteristics of the Defendant**

The history and characteristics of Defendant documented in the PSR do little to explain the criminal conduct in this case. A child of divorce, Defendant graduated from high school in 2008, then went on to culinary school where he earned a two-year degree. PSR ¶¶ 79-81. He married, had a child, then divorced – all before the offense conduct took place. Defendant is physically healthy overall and continues to have the support of his mother. PSR ¶¶ 61-78. His infrequent contacts with the criminal justice system are relatively minor (PSR ¶¶ 51-57) and although he has suffered setbacks and challenges in his personal life, none appear to explain Defendant's turn to an extremist ideology and the resulting criminal conduct in this case.

**C.      Promoting Respect for the Law and Providing Just Punishment
for the Offense**

Defendant stands before the court convicted of one of the most serious crimes in the federal criminal code.  In fact, the Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2724 (2010). The seriousness of the offense is adequately reflected in a 20-year sentence, as is respect for the law and just punishment. Respect for the law is a particularly important factor in this case beyond just Defendant himself. A serious sentence

is needed to promote respect for the law, not just for Defendant, but for others who would support him, his well-armed anarchist cause, and his efforts to undermine local, state, and federal governments.

### D. Deterrence and Protecting the Public

Terrorism, being motivated by fanaticism, is difficult to deter. The effort must nevertheless be made. The recommended sentence in this case is needed for both individual and general deterrence, and to furthermore protect the public from Defendant's dangerous ideology and behavior. Individual deterrence discourages a defendant from committing such a crime in the future. Whether Defendant is deterred will depend, in part, on whether he can successfully loosen his grip on radical thought and action.

General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)). General deterrence is necessary to impress upon the greater community that no matter the circumstances, aiding a designated terrorist organization – no matter what the purpose – has dire consequences. A substantial sentence is necessary to deter individuals from supporting international terrorism in any form or under any circumstances.

The need for a sentence that protects the public is plainly evidenced by Defendant's conduct and words in this case. His willingness to aid in a plot to blow up a courthouse, his spoken desire to assassinate politicians and journalists, and his provision of silencers

and auto-sears to individuals he believed were members of Hamas for use against American service-members all speak to the danger represented and the appropriateness of the requested sentence.

### E.    The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment

Where Defendant stands on a spectrum of deradicalization is uncertain. The government will, of course, support Defendant receiving any programming offered by the Bureau of Prisons that will reduce the risk he represents to the public when he is eventually released from prison. The sentence recommended by the government will allow sufficient time for professionals to work towards stabilizing Defendant's extremist ideology and promoting his law-abiding conduct in the future.

### G. The need to avoid unwarranted sentencing disparities

The recommended sentence would not create an unwarranted disparity. In the District of Minnesota and elsewhere, courts have imposed lengthy sentences on offenders who have conspired or attempted to provide material support to designated foreign terrorist organizations.  Be it *al Shabaab*, ISIS, *al Qaeda*, or Hamas, there are similarities to be found in these cases, despite the unique nature of the facts presented in this case. Like the case at bar, defendants with little to no criminal history have attempted or conspired to provide material support to terrorist organizations from all over the world. Most have offered themselves in support of those deadly organizations but here, Defendant offered his specialized knowledge, his skills, his access to weaponry, and – as he stated – his ability to "*move around really freely*" as a "*redneck.*"   PSR, ¶ 16.

Unlike some others, this case is not limited to a single attempt to travel overseas to join a foreign terrorist organization. Instead, Defendant's case involves efforts over the course of months to forge an alliance between the Boogaloo Bois and Hamas. Convinced they were ideologically aligned, Defendant sought to capitalize on his knowledge of firearms, silencers, and machine guns, and on what he believed was the terrorist organization's need for that weaponry. While the government is fully cognizant of the fact that Defendant was not, in fact, dealing with members of Hamas, the Defendant believed he was. The threat to public safety represented by his conduct and his radicalized beliefs is no less significant, and thus, nor should the sentence be less significant.

## V.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant Michael Solomon to a term of imprisonment of 240 months, followed by lifetime supervised release.

Dated: September 20, 2021                Respectfully submitted,

                                         W. ANDERS FOLK
                                         Acting United States Attorney

                                         *s/ Andrew R. Winter*

                                         BY: ANDREW R. WINTER
                                         Assistant United States Attorney
                                         Attorney ID No. 232531