1

                UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     United States of America,      )   File No. 20-cr-00193
4                                    )            (MJD/ECW)
              Plaintiff,            )
5                                    )
     vs.                            )   Minneapolis, Minnesota
6                                    )   March 10, 2022
     Michael Robert Solomon,        )   11:33 A.M.
7                                    )
              Defendant.            )
8    ------------------------------------------------------------

9
              BEFORE THE HONORABLE MICHAEL J. DAVIS
10               UNITED STATES DISTRICT COURT JUDGE
                       **(SENTENCING HEARING)**
11
     **APPEARANCES:**
12     For the Plaintiff:        United States Attorney's Office
                                 ANDREW R. WINTER, AUSA
13                               300 South Fourth Street
                                 Suite 600
14                               Minneapolis, MN 55415

15     For the Defendant:        Paul Engh Law Office
                                 PAUL C. ENGH, ESQ.
16                               200 South Sixth Street
                                 Minneapolis, MN 55402
17

18     Court Reporter:           PAULA K. RICHTER, RMR-CRR-CRC
                                 300 South Fourth Street
19                               Minneapolis, MN 55415

20

21

22

23       Proceedings reported by certified stenographer;
     transcript produced with computer.
24

25

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3      (Defendant present)

4          THE COURT:  Let's call this matter.

5          THE CLERK:  The United States of America versus

6  Michael Robert Solomon, criminal case number 20-CR-193.

7  Counsel, please state your appearances for the record.

8          MR. WINTER:  Good morning, Your Honor.  Andrew

9  Winter appearing on behalf of the United States, accompanied

10  by Probation Officer Leah Heino.

11          THE COURT:  Good morning to both of you.

12          MR. ENGH:  Paul Engh on behalf of Mr. Solomon.

13  Good morning, Your Honor.

14          THE COURT:  Counsel, so you understand how I

15  handle my courtroom, I'm going to ask you to take your mask

16  off so I can hear you, and either you can stay at your

17  tables and make sure your microphones are on or you can use

18  the podium to argue and advocate for your client.

19          So what is your pleasure, Mr. Engh?  You can take

20  your mask off.

21          MR. ENGH:  I'll use the podium.

22          THE COURT:  All right.  Please.  Your client can

23  go up there with you.

24          All right.  We're here for sentencing; is that

25  correct?

1              MR. ENGH:  Correct.

2              THE COURT:  Are those microphones on there?

3              MR. ENGH:  Yes, they are.

4              THE COURT:  Make sure you speak into the

5     microphone so I can hear you.

6              Counsel, have you had an opportunity to read the

7     presentence investigation report in this matter?

8              MR. ENGH:  We have.

9              MR. WINTER:  The Government has, yes.

10             THE COURT:  You have to take your mask off,

11    please.

12             MR. WINTER:  Yes, the Government has.

13             THE COURT:  Any objections to the factual

14    statements contained in the presentence investigation

15    report?

16             MR. ENGH:  No, Your Honor.

17             MR. WINTER:  None from the Government.

18             THE COURT:  The Court will adopt the factual

19    statements contained in the presentence investigation report

20    as its own.

21             Counsel, have you had an opportunity to review the

22    advisory guideline calculations that have been prepared for

23    the Court?

24             MR. ENGH:  Yes, we have.  Yes.

25             THE COURT:  Any objections to those calculations?

1          MR. ENGH:  We have stated our objections in our

2     pleadings.  We rest on the pleadings, Your Honor.

3          MR. WINTER:  The Government has no objections.

4          THE COURT:  The Court will overrule the defense

5     objections.  The total offense level will be 37 as

6     recommended by the probation office, criminal history

7     category of 6.  The guideline range is 240 months in prison,

8     supervised release of five years to life, a fine range of

9     $40,000 to $250,000, and a special assessment of $100.

10          The Court has received from the Government a

11     motion for a downward departure.  Because the defendant has

12     given substantial assistance to the Government, the

13     Government is requesting that the Court grant their motion

14     for a downward departure under 5K1.1 of the Sentencing

15     Guidelines based on the substantial assistance of the

16     defendant.

17          Does the Government have anything further they

18     wish to add to their filing?

19          MR. WINTER:  No, Your Honor.

20          THE COURT:  Anything the defense wishes to add?

21          MR. ENGH:  Nothing beyond our pleading to you,

22     Your Honor.

23          THE COURT:  The Court will grant the Government's

24     motion for a downward departure because the defendant has

25     given substantial assistance to the Government and qualifies

1    under 5K1.1.

2              Mr. Engh, do you wish to be heard?

3              MR. ENGH:  I do, Your Honor.

4              THE COURT:  All right.

5              MR. ENGH:  Mr. Solomon and I have been together

6    now for a year and a half, and he's like a lot of young men

7    and he has difficulty in expressing the emotion of loss, and

8    I'd like to talk to you about the emotion of loss for him in

9    my comments today.

10             He is deeply regretful of what he did and what he

11   has said.  That is set forth in the PSI.  He was living a

12   good life.  He was a maintenance man, made a good living,

13   drove his own car, had his own place to live.  He had a

14   six-year-old daughter he adored.  And he has lost all of

15   that.  He will apologize to the Court and to his society in

16   short order, and he has a written statement that he's going

17   to read into the record.

18             But the first loss he has suffered is the loss of

19   his community.  He has damaged his own community.  He has

20   lost his stature in the community.  He is now branded as a

21   felon, which will stay with him for the rest of his life.

22   And for him, that was a significant loss and will always be.

23   The ramifications of this case are unending for many

24   defendants who come before you, and certainly it is for this

25   case.

1          The second loss is the loss of fatherhood.  One of

2     the great joys in a man's life is to be a father, to bring a

3     child into the world and to nurture that child, or children.

4     And he has, through his conduct, lost that.  It's a loss not

5     only to himself, of course, because he's going to miss the

6     joys of being a father and loving a child, but the child has

7     lost her father, which is a greater tragedy, of course, and

8     perhaps the greatest tragedy in the case.  The abandonment

9     that the child will feel and the loss of affection and loss

10    of a father through this time period and whatever period of

11    time you think he should serve is something that never can

12    be replaced.  It's not something you can get back.  It's not

13    something you can really apologize for.

14          The tragedy in the case, of course, is Mr. Solomon

15    lost his own father, and now that tragedy is compounded here

16    because he has lost a fatherhood for his child whom he

17    really adores, and he has told me how much he loves his

18    daughter almost every time I've met him.

19          The third loss is the loss of being a son to his

20    parents.  His mom is here.  Sharon is right there.  And his

21    stepdad, George, is right behind me.  You know, he really

22    adored his mom, and I've had many conversations with Sharon

23    as well and she loves him unconditionally and is most

24    disappointed with what has happened here.

25          THE COURT:  I didn't see her.  Where is she?

1          MR. ENGH:  She's right here.

2          And as I said, I've had many conversations with

3    Mr. Solomon and his mom about the case.  Her devotion is

4    unending and disappointed at the same time.  But she's been

5    with me and him throughout the entire case.  There's no

6    turning back for her.  It hasn't been the easiest life, I

7    don't think, for her either.  And I appreciate George's

8    support too, and he's also submitted -- Mr. Solomon has

9    several letters from the community.

10          So it's a sad day for him and it's a sad day for

11   everybody involved and society in general to see a member

12   that was doing so well to have fallen so far.  But he has

13   tried to make amends.  His decision to plead was made

14   immediately before I even had a chance to read the 3,000

15   pages of discovery, and he's done everything he can possibly

16   do to mitigate his damage now.  And I know the Court will

17   take that into account.

18          In addition to the loss he feels, a few comments

19   should be made as to the nature of his confinement.  He's

20   been at Sherburne County, of course, for the last year and a

21   half.  The time served there has been harder than it would

22   be in a federal penitentiary.  These local jails were never

23   designed for COVID, and the venting system is shared by

24   every cell.  Mr. Solomon himself has asthma and has had

25   COVID twice.  He reports to me that he has been in lockdown

1    for five months out of the year and a half he's been there,

2    and a lockdown in Sherburne County is 23 hours in, 1 hour

3    out.  The last lockdown of a month was a little better, 20

4    hours in, 4 hours out.  But these places were never designed

5    for extended stays, and it's not anybody's fault that the

6    case has been delayed.  COVID has delayed all cases.  But

7    it's been beyond his control.

8           It's also difficult, I think, you know, to

9    represent defendants who are in lockdown, so I feel a sense

10   of loss too because I haven't been able to bond as much as I

11   would otherwise with Mr. Solomon.  And I think there has

12   been a loss to the defense bar and the court system by the

13   COVID restrictions, which were necessary.  So I think we've

14   all been a little diminished in the last couple of years by

15   what has happened beyond our control.

16          But there has been a larger context too in the

17   last year or two, and I think it's that there has been a

18   recognition in light of COVID and other factors that perhaps

19   that the sentences for first-time offenders are a little

20   longer than they needed to be.  This resulted in all the

21   First Step Act releases and the releases for individuals who

22   had health conditions such as asthma.  And so tens of

23   thousands of inmates, especially first-time offenders

24   through the federal system, were released early.  And maybe

25   the lesson there for all of us is that the times may have

1    been a little longer than necessary for the first-time

2    offender.  Not -- that can't be said for the second, third,

3    or fourth time through.

4           But for Mr. Solomon, he's certainly learned his

5    lesson.  He will accept whatever punishment you have.  But

6    the question that comes to my mind anyway is that we may be

7    overincarcerating the first-time offender.  And I say that

8    in all due respect because I know the Court has thought

9    about this as well.  I believe you have.  And it is the

10   nature of the guidelines for this case, the severity level

11   is high and the criminal history is high, that the

12   guidelines are higher than perhaps they should be for a case

13   like this.  So we're left with comparisons, I suppose, as to

14   who he is closest to in terms of time, and that's difficult

15   to say because there aren't any Boogaloo Bois cases besides

16   his and a couple of others.  I do know that his related case

17   defendant, Hunter, is going to get five years by his

18   agreement, and he fired shots into the police station.

19          THE COURT:  Well, he fired 13 shots with an AK-47

20   into the --

21          MR. ENGH:  Yeah, into a doorway.  And Mr. Solomon

22   did not do that.

23          THE COURT:  And my understanding, there may have

24   been police officers still in the Third Precinct at that

25   time, so I understand that what -- his maximum sentence is

1    60 months, his guideline sentence range is around 46 months.

2    I may be wrong with that, but that's my guesstimate.

3              MR. ENGH:  Well, the point you're making, he did

4    fire shots and Mr. Solomon, upon seeing that, expressed his

5    great disappointment and removed Hunter from the scene and

6    told him to get out of there and go home.  And so his

7    intention was not to engage in a violent act like that.

8              And he did talk a lot of talk, I'll agree with you

9    there, but we have a distinction or at least a comparison

10   between someone who talked a lot and someone that actually

11   fired a gun, and I think it's a comparison that's apt.  But

12   I leave it to you to make that comparison as well.

13             He's ready to be sentenced.  He's been eager to be

14   in front of you just to resolve this thing.  There's a great

15   angst for defendants in not knowing.  It's always better to

16   know than not know, and he'll understand what his punishment

17   is and he will submit to whatever you think is fair.

18             THE COURT:  All right.  Michael, this is your

19   opportunity to speak to me.  This is your opportunity to

20   tell me anything that you want to tell me about yourself,

21   about this offense or anything else that you think I should

22   know before I sentence you.  Please talk to me.  If you have

23   papers, please go get them.

24             THE DEFENDANT:  Sorry.  I'm a little nervous, so

25   I'm going to try not to rush through this.

 1              THE COURT:  No, just take your time.

 2              THE DEFENDANT:  I submitted a letter to the Court

 3     that explains my feelings in more detail.  It was a

 4     two-and-a-half-page letter, and that was kind of boiled down

 5     from a 30-page letter explaining everything, my background,

 6     my kind of journey down the rabbit hole into this and into

 7     the mistakes I made that I gave Paul here.  So after I was

 8     at the jail for a couple months, I really thought -- I spent

 9     about two weeks writing about 30 pages on just detailing how

10     I messed up and how I planned to do better hopefully for the

11     rest of my life.

12              I wanted to reiterate that I'm sorry for my

13     actions, I'm sorry for the pain that I did cause and for all

14     of the pain that I could have caused that could have gone

15     further.

16              I'm appalled, I'm embarrassed at the actions that

17     I made.  I'm shocked that I ever let myself make those

18     decisions, but I can and I do promise that I will never

19     allow that to happen again.  I also know that I can never

20     make up for the pain and suffering that I've put my

21     daughter -- that I've put my daughter, my parents, my loved

22     ones through, but I will try to be a better father, a better

23     son, and a better friend that they deserve.

24              And lastly, while I hope for leniency and I hope

25     to get back to being a father and being a member of society

1    as soon as I can, I realize that I owe that society a debt

2    for my actions.  And that's part of the reason why I chose

3    to mitigate my damages as much as I could by helping undo

4    whatever I could as far as the harm that I caused, and I

5    accept whatever Your Honor decides that to society should

6    be.  And I'm sorry for what I did.

7            THE COURT:  Okay.  Have a seat, sir.

8            Mr. Engh, stay there and call his mother up.

9            Good morning.

10            MS. PAWLITSCHEK:  Good morning.

11            THE COURT:  I'm Judge Davis and over the years

12    I've handled over 20 terrorism cases, and I've always had

13    the parents come up and talk to me before I have to sentence

14    their child.

15            And I don't know if you have anything that you

16    want to tell me.  Why don't you state your name for the

17    record.  And if you do have anything you wish to tell me, I

18    would like to hear it.

19            MS. PAWLITSCHEK:  My name is Sharon K.

20    Pawlitschek.

21            It's hard to know what to say because there's so

22    many different things that I've felt and experienced over

23    the last 18 months.  I love my son very much.  I always have

24    and I always will.  At his core, he's a good person.  He's a

25    good father.  I know that he did make a mistake, and I

1    recognize that he has to pay for that, and he knows that

2    too.

3              I have seen growth and maturity in him in the last

4    18 months by things he has said, tears he has shed that I

5    hadn't seen him do since he was 13 years old.  So I know

6    that he means what he says.

7              He wants to be a father.  He wants to be a part of

8    his family again.  And he wants to put his life back

9    together and start his life over and do the best that he

10   can.

11             THE COURT:  Thank you.

12             MS. PAWLITSCHEK:  Thank you, Your Honor.

13             THE COURT:  You may be seated, Mr. Engh.

14             Mr. Winter?

15             MR. WINTER:  Thank you, Your Honor.

16             The comments I'm going to be making, I want to

17   talk a little bit about the offense.

18             And as the Court is aware, what we would have

19   asked for in this case had he not made the good decisions he

20   did at the end of the case, which was to plead guilty

21   promptly and to cooperate, but before we get there, I think

22   it's helpful if I can talk a little bit about what we would

23   have been asking for and why.

24             At no point during the developing conspiracy to

25   arm people that he thought were members of Hamas did he say

1     to anybody, this is crazy or maybe this isn't such a good

2     idea.  At no point did he express any hesitation when he

3     knew and understood that the auto sears and the silencers he

4     was turning over were going to be used against potentially

5     U.S. citizens, military personnel, people that could have

6     been his neighbors, people that could have even been his

7     family members.

8             The mindset that put him in that place, the rabbit

9     hole that he referred to going down, the mindset is truly

10    mind-boggling.  It doesn't make any sense to I think anybody

11    in this courtroom.  And certainly we agree that his plans

12    that he talked about were grandiose, actually grandiose and,

13    again, sort of mind-boggling and arguably crazy.  But it

14    makes one wonder just how far he would have gone had this

15    financial pipeline he was seeking for the Boogaloo Bois been

16    real rather than fictional.  And fortunately, we don't know

17    how far he would have gone because he was arrested and the

18    whole thing was brought to an end.

19            But we do know --

20            THE COURT:  May I interrupt you?

21            MR. WINTER:  Yes, absolutely.

22            THE COURT:  One of the things that's not clear to

23    me, certainly the talk of $200 million and having a training

24    site is a pipe dream, but I've never been able to parse out

25    of the materials that you've submitted or that defense have

1    submitted or even the probation office has given me is how

2    much money was transferred here for these five suppressors

3    or sears.

4              MR. WINTER:  If memory serves, Your Honor, the

5    initial batch that were supplied from the defendant and his

6    co-conspirator, Mr. Teeter, were essentially tendered as a

7    proof of concept, if you would.  Here's what we can do;

8    here's five functional suppressors, which the Bureau did

9    test and they worked.  And then there was discussion about

10   the next batch, which never happened, so that --

11             THE COURT:  Now, those suppressors came from out

12   of state; is that correct?

13             MR. WINTER:  The parts -- as I remember, the parts

14   for the suppressors were delivered to Solomon and Teeter via

15   the Internet, and I think they came from out of state.  And

16   they did their thing to them to turn them into an actual

17   suppressor.  They had to machine these devices into being

18   functional suppressors, which required them to get the

19   tools, which as the PSR talks, the drill press that they

20   obtained.

21             So the parts came in from out of state and they

22   did their work in his home, and then they were turned over

23   to the CHS and the UCE, again as sort of a proof of concept;

24   here's the kind of work we can do for you.

25             THE COURT:  Was there ever a price tag?

1      MR. WINTER:  There was discussion about -- there

2   was discussion about dollar amounts in the future, prices,

3   and again, a discount being offered if the purported Hamas

4   members ordered these in bulk.  I don't remember off the top

5   of my head specifically what those numbers were, but it was

6   in the thousands of dollars.

7          And at the time of --

8          THE COURT:  Mr. Engh, do you have any recollection

9   of anything that's been said dealing with the price?

10         MR. ENGH:  I thought -- my memory is $800 per.

11   That's my memory.

12         MR. WINTER:  And that sounds about right, Your

13   Honor.

14         And then there was talk of --

15         THE COURT:  And those parts came from West

16   Virginia; is that right?

17         MR. WINTER:  The auto sears?

18         THE COURT:  The auto sears.

19         MR. WINTER:  Yes.  Those came from a website run

20   by another Boogaloo Boi who is located in West Virginia.

21         THE COURT:  And my understanding is that the

22   Government didn't know about him until Mr. Solomon gave

23   information about him.

24         MR. WINTER:  He was certainly -- Mr. Solomon's

25   information was certainly instrumental in identifying and

1    taking down that website.

2              THE COURT:  Well, let's do more than that.  My

3    understanding is that -- and I need to be clear, I'm making

4    sure that I understand, is that it was Mr. Solomon's

5    information that took down that website that was part of the

6    getting the search warrants and arresting Mr. Watson down in

7    West Virginia.

8              MR. WINTER:  Yes, that's absolutely true.

9              THE COURT:  All right.  All that's been filed.

10   And this was -- the reason why I'm talking about it, because

11   it's important for me to know, the U.S. Attorney for the

12   Northern District of West Virginia put out a press release,

13   so I know about it and I know the transcript and everything

14   else about what happened with Mr. Watson.

15             Now, Watson was a big player.

16             MR. WINTER:  Yes.

17             THE COURT:  A huge player.

18             MR. WINTER:  Put a lot of auto sears out in the

19   community, for sure.

20             THE COURT:  How many?

21             MR. WINTER:  Over 200.

22             THE COURT:  Why does West Virginia say 800?  The

23   U.S. Attorney says 800.

24             MR. WINTER:  If they said it's 800, then it's 800.

25   I'm sorry.  I'm going by my memory.

```
 1              THE COURT:  And they had the list of 800 -- of the

 2     selling of 800 of these and they have been able to recover

 3     200, right?

 4              MR. WINTER:  Yes.

 5              THE COURT:  And isn't it a fact that Watson sold

 6     an auto sear to, what is it, Cattrell out in California, who

 7     killed two police officers?

 8              MR. WINTER:  I think you're referring to Steven

 9     Carrillo.

10              THE COURT:  Carrillo.

11              MR. WINTER:  I don't know.  That could very well

12     be the case.  They were certainly -- the Boogaloo Bois were

13     certainly all connected online.  It wouldn't shock me at

14     all.

15              THE COURT:  Again, I'm going by what the

16     U.S. Attorney for West Virginia is saying.  I'm assuming

17     that he wouldn't puff.

18              MR. WINTER:  He wouldn't.  I wouldn't quibble with

19     that, Your Honor.

20              THE COURT:  All right.  And so I dug a little

21     deeper to see whether or not the killer used the auto sears

22     to kill the police officers, but it seems like they don't

23     know or it hasn't -- it hasn't been found that they were

24     used.  But at least here we have Mr. Solomon turning over to

25     the Government someone that has done great damage.
```

```
 1                  MR. WINTER:  Absolutely.

 2                  THE COURT:  More damage than five auto sears or

 3      suppressors, right?

 4                  MR. WINTER:  Yes.

 5                  THE COURT:  And tell me what the sentence was for

 6      Mr. Watson in West Virginia.

 7                  MR. WINTER:  I'd have to look at my --

 8                  THE COURT:  I'll tell you.  Sixty months.

 9                  MR. WINTER:  Sixty months.

10                  THE COURT:  Yeah, 60 months.

11                  MR. WINTER:  Yes.

12                  THE COURT:  And I know that you hadn't gotten to

13      the numbers yet, but let's jump to it.  But initially you'd

14      be asking for 240 months for Mr. Solomon, but because of the

15      substantial assistance, you're going to ask for 120, 140

16      months; is that right?

17                  MR. WINTER:  Yes.

18                  THE COURT:  Now, Mr. Winter, you're aware of your

19      office charging other individuals that were involved in the

20      destruction, the rioting, the burning of our city, the Third

21      Precinct and other buildings, charged with arson?  You're

22      aware of that?

23                  MR. WINTER:  Yes, certainly.

24                  THE COURT:  And you have videotape evidence of

25      those individuals pouring gasoline into the Third Precinct,
```

1    into the pawnshops, into the Sprint stores and lighting and

2    burning the buildings, right?

3              MR. WINTER:  Yes.

4              THE COURT:  And those are overt acts, right?

5              MR. WINTER:  Certainly.

6              THE COURT:  And in one, the restitution amount is

7    $12 million.

8              MR. WINTER:  Yes.

9              THE COURT:  And that's never going to be

10   recovered, is it?

11             MR. WINTER:  No.

12             THE COURT:  And in one of the buildings there was

13   a body found, and the coroner established that the cause of

14   death was inhaling of the smoke and inhalants, right?

15             MR. WINTER:  Yes.

16             THE COURT:  And that person was charged out

17   through the U.S. Attorney's Office here.

18             MR. WINTER:  Yes.

19             THE COURT:  And he only received 144 months.

20             MR. WINTER:  Yes, that sounds right.

21             THE COURT:  And there was a dead body in the

22   building.

23             MR. WINTER:  Yes, there was.

24             THE COURT:  And he had a serious criminal history,

25   the defendant.

```
 1                MR. WINTER:  I'll take your word for it.

 2                THE COURT:  And we're talking about Maurice Lee,

 3     Jr. from Rochester.

 4                I'll make sure I got the right numbers.  No.  I'm

 5     sorry.  Maurice Lee got 120 months.

 6                And in Mr. Lee's case, it was argued before the

 7     judge by the Assistant U.S. Attorney that Mr. Lee just got

 8     caught up in everything and burned down the building, right?

 9                MR. WINTER:  I recall that argument.

10                THE COURT:  And all of a sudden Mr. Lee is

11     standing and a can of accelerant is right next to him and

12     all of a sudden he jumps up and burns down a building,

13     right?

14                MR. WINTER:  I'll take your word for it.

15                THE COURT:  Well, that's a case that came out of

16     your office, isn't it?

17                MR. WINTER:  It is.

18                THE COURT:  Now, Mr. Solomon didn't burn down any

19     buildings, did he?

20                MR. WINTER:  No, he did not.

21                THE COURT:  Mr. Solomon didn't shoot an AK-47 into

22     the Third Precinct, did he?

23                MR. WINTER:  No, he did not.

24                THE COURT:  Mr. Solomon doesn't have a criminal

25     history score other than 1, and because of him being charged
```

1    with terrorism, it jumps up to 6, right?

2              MR. WINTER:  That's correct.

3              THE COURT:  And certainly the Government could

4    have allowed him to plead to Counts 3 and 4 of the

5    indictment, and he would have probably ended up with a

6    sentence similar to other arsonists and criminals that

7    burned Minneapolis.

8              MR. WINTER:  Yes.

9              THE COURT:  And Hamas is a hot-bed organization in

10   the Twin Cities, right?

11             MR. WINTER:  I'm sorry.  I didn't hear the first

12   part.

13             THE COURT:  I said Hamas is a hot-bed organization

14   in the Twin Cities, right?

15             MR. WINTER:  If your question is do we have Hamas

16   members running around the Twin Cities, the answer is

17   certainly not to my knowledge.

18             THE COURT:  And Matthew Lee Rupert, charged with

19   arson, burned down the Sprint store, ended up with 105

20   months in prison, right?  And he had a criminal history of

21   14 points, so he was a category 6.

22             MR. WINTER:  Yes.

23             THE COURT:  You would not dispute that, would you?

24             MR. WINTER:  I would not.

25             THE COURT:  Mark Gonzalez, conspiracy to commit

1    arson, Wells Fargo Bank, burning that building, he had eight

2    points and that was a category 4, and he received 37 months

3    in prison, right?

4              MR. WINTER:  Yes.

5              THE COURT:  Alexander Heel, conspiracy to commit

6    arson at the Wells Fargo Bank, he had four points, a

7    category 3, I believe.  He ended up getting a sentence of 30

8    months.

9              MR. WINTER:  Yes.

10             THE COURT:  And then we had Michael Scott White,

11   he had 29 points, a category 6, arson, burned down the

12   Enterprise Rent-a-Car business in St. Paul, and he had 72

13   months with a restitution of $672,000.

14             You're not going to dispute that, are you?

15             MR. WINTER:  No.

16             THE COURT:  And then we had McKenzy Ann DeGidio

17   Dunn, conspiracy to commit arson, category 1, she only had

18   one point.  And she got a 5K 2.20 and ended up with three

19   years' probation with $31,000 restitution.

20             You're not going to dispute that?

21             MR. WINTER:  No.

22             THE COURT:  And how much restitution is

23   Mr. Solomon going to have to pay?

24             MR. WINTER:  I don't think any.

25             THE COURT:  And then we have Samuel Elliot Frey,

1    F-R-E-Y, arson and conspiracy to commit arson.  That's a

2    pending case, I guess.  And he's looking at 27 months with

3    $34,000 restitution.

4            You're not going to disagree with that?

5            MR. WINTER:  No.

6            THE COURT:  Now, here's an interesting case.

7    Someone that actually burned a courthouse, Garrett Patrick

8    Ziegler, aiding and abetting arson, Dakota County Government

9    Center in Apple Valley, he received a sentence of 60 months

10   with restitution of $205,000, done to a government

11   courthouse.

12           You would agree to that?

13           MR. WINTER:  Yes.

14           THE COURT:  And so we move to his co-defendant,

15   Mr. Henderson.  I can't pronounce his first name.  Now,

16   Ziegler had zero points, and so he was a category 1.  And

17   Mr. Henderson, he had ten criminal history points.  He's a

18   category 5, and so he ended up with 78 months imposed for

19   burning a courthouse and restitution of $205,000.

20           And that was charged out of your office; is that

21   right?

22           MR. WINTER:  Yes.

23           THE COURT:  Then we have Brandon Michael Wolf,

24   conspiracy to commit arson of the Third Precinct, 41 months.

25   He's on the hook for $12 million restitution.  Right?

```
 1                    MR. WINTER:  Yes.

 2                    THE COURT:  And then we have Bryce Michael

 3       Williams, conspiracy to commit arson of the Third Precinct,

 4       zero points -- criminal history points, and he ended up with

 5       27 months in prison and restitution of $12 million.

 6                    MR. WINTER:  Yes.

 7                    THE COURT:  Then we had Davon De-Andre Turner,

 8       conspiracy to commit arson, the Third Precinct.  I'm sure

 9       you saw that building burn on TV.

10                    MR. WINTER:  Indeed.

11                    THE COURT:  He ended up with 36 months in prison

12       with a $12 million restitution, right?

13                    MR. WINTER:  Yes.

14                    THE COURT:  And then we have Dylan Shakespeare

15       Robinson.  He ended up with 48 months with $12 million

16       restitution, right?

17                    MR. WINTER:  Yes.

18                    THE COURT:  Then an unrelated Boogaloo case,

19       Michael Dahlager, he's looking at 24 months because he had

20       unlawful possession of a machine gun, right?

21                    MR. WINTER:  Yes, auto sears.

22                    THE COURT:  And I think Mr. Solomon gave

23       substantial assistance against Mr. Ivan Hunter, and he's

24       looking at, as I mentioned before, 46 months for riot.

25                    MR. WINTER:  Yes.
```

```
 1                    THE COURT:  Actual riot.

 2                    MR. WINTER:  Yes.

 3                    THE COURT:  Shooting into the Third Precinct.

 4                    MR. WINTER:  Yes.

 5                    THE COURT:  You can continue.

 6                    MR. WINTER:  Your Honor, the rest of my comments,

 7      you know, were aimed towards, you know, that the comments

 8      that Mr. Solomon made during the course of the case.  And we

 9      can talk about, you know, bravado, puffery, making

10      statements that he surely regrets today and has regretted, I

11      think, since the moment of his arrest.

12                    Part of what's troubling was, you know, when they

13      went out to do the arrest and the search warrants, they find

14      in his home the tools to cause harm, the body armor, the

15      handcuffs, three assault rifles.  And so -- and that was

16      going to be the conclusion of my sort of argument, and then

17      I was going to turn towards the fact that fortunately in

18      this case he -- everything he's done since the day of his

19      arrest has been to make amends, which again, we've set forth

20      in our 5K memorandum.  I can also tell you that that process

21      is ongoing.  And I'm happy to answer any additional

22      questions that the Court has.

23                    THE COURT:  And what is the Government's

24      recommendation for sentence?

25                    MR. WINTER:  Well, as our memo laid out, we were
```

1    asking for 140 months.  Obviously the Court can sentence,

2    particularly with the 5K in place, to whatever the Court

3    feels is appropriate.  I appreciate the fact the Court has

4    highlighted these other cases, and I am sure the Court will

5    factor all those things in, particularly if you're looking

6    at 3553(a) and the disparities and sentence Mr. Solomon

7    appropriately.

8               THE COURT:  All right.  Thank you, Mr. Winter.

9               Please step back up.

10              All right.  Michael Robert Solomon, on May 4th,

11   2021, you pled guilty to conspiracy to provide material

12   support to a designated foreign terrorist organization in

13   violation of Title 18 United States Code Section

14   2339B(a)(1).  It is considered and adjudged that you are

15   guilty of that offense.

16              I have gone over the guideline calculations that

17   have been provided to the Court, and I have accepted those,

18   and I don't need to go over them again.  I think it's clear

19   what your potential guideline sentence could look at, at 240

20   months in prison.

21              Mr. Engh knows and Mr. Winter knows that I've

22   handled practically all the terrorism cases that were in

23   this district and probably the one judge in the whole

24   country that's handled more terrorism cases.  And I've

25   handed out substantial sentences to some of the individuals

1  that were charged with terrorism, and I've given probation

2  to some individuals that have been charged and convicted of

3  terrorism.

4         So I look at each case individually.  I look at

5  your case individually, and let me tell you, I've looked at

6  everything to try to figure out that you're a bad guy.  Even

7  if you are a bad guy, there's other bad guys out there that

8  are doing way less time than you.

9         I haven't even talked to Mr. Winter about the

10  January 6th insurrectionists that have been convicted in

11  Washington, D.C. and the types of sentences they have.  And

12  we have the videotape.  We watched that on TV.  And I know

13  the judges out in Washington, D.C., and they're tough as

14  nails and so I know that they're not giving away the ship,

15  but they're giving what they feel is appropriate sentences.

16  And nothing, nothing that has happened at the insurrection

17  in our country on January 6th, there's not one person that

18  has looked at 240 months in prison or 140 months or 120

19  months.

20         The Court has read the presentence investigation

21  report.  The Court has read the submissions of counsel.  The

22  Court has granted the Government's motion under 5K1.1 that

23  the defendant has given substantial assistance to the

24  Government and is continuing to give substantial assistance

25  to the Government.  And if there's a need for you to come

1    back after I sentence you under the appropriate rule, I'll

2    deal with that at that time.

3            The Court has read all the pertinent United States

4    Supreme Court decisions and Eighth Circuit Court of Appeals

5    decisions and other circuit and district court opinions

6    dealing with terrorism cases, and of course, the Court will

7    apply the factors under Title 3553(a) in sentencing you here

8    today.

9            Because of your substantial assistance to the

10   Government, the Court is going to give you the following

11   sentence:  Defendant is hereby committed to the care and

12   custody of the Bureau of Prisons for a term of 36 months.

13           There is no fine imposed.

14           The defendant is sentenced to a term of five

15   years' supervised release.

16           The following mandatory conditions are applicable:

17   The defendant shall not commit any crimes, federal, state or

18   local.

19           The defendant shall not unlawfully possess a

20   controlled substance.

21           The defendant shall refrain from any unlawful use

22   of a controlled substance.

23           The defendant shall submit to one drug test within

24   15 days of release from imprisonment and at least two

25   periodic drug tests thereafter as determined by the Court.

1          Next, the defendant shall cooperate in the

2    collection of DNA as directed by the probation officer.

3          Next, the defendant shall abide by the standard

4    conditions of supervision that have been adopted by this

5    Court, including the defendant must report to the probation

6    office in the federal judicial district where the defendant

7    is authorized to reside within 72 hours of defendant's

8    release from imprisonment unless the probation officer

9    instructs the defendant to report to a different probation

10   office or within a different time frame.

11         And the defendant shall not own, possess, or have

12   access to a firearm, ammunition, destructive device, or any

13   other dangerous weapon.

14         And I'll say that again, sir, so you understand it

15   and it will be tattooed on your arm.  You are not to own,

16   possess, or have access to a firearm, ammunition,

17   destructive device, or any other dangerous weapon.

18         Do you understand that?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Defendant shall comply with the

21   following special conditions:  Defendant shall provide the

22   probation officer access to any requested financial

23   information including credit reports, credit card bills,

24   bank statements, and telephone bills.

25         The defendant shall not possess, view, access or

1    otherwise use material that reflects extremist or terrorist

2    views as deemed inappropriate by the United States Probation

3    Office.

4              Next, the defendant must submit to periodic

5    polygraph testing at the discretion of the probation officer

6    and me as a means to ensure compliance with the requirements

7    of supervision.  And I've used the polygraph on my other

8    terrorist defendants and rest assured, I'll surprise you

9    when I want it done.

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  The defendant shall reside for a

12   period of up to 180 days in a residential reentry center as

13   approved by the probation officer and shall observe the

14   rules of that facility, which may include location

15   monitoring with global positioning system, GPS technology.

16             The defendant shall be restricted to this

17   residence at all times except for employment, education,

18   religious services, medical, substance abuse, or mental

19   health treatment, court obligations, or discretionary leave

20   activities as approved by the probation officer or this

21   Court.  The defendant shall not be required to pay the costs

22   of location monitoring.

23             Next, the defendant shall not possess or use a

24   computer or have access to any online service without prior

25   approval of the United States Probation and Pretrial

1    Services Office.

2         The defendant's cooperation shall include but not

3    be limited to allowing installation of a computer and

4    Internet monitoring program and/or identifying computer

5    systems, Internet-capable devices, and similar memory and

6    electronic devices to which the defendant has access.

7    Monitoring may include random examinations of computer

8    systems, along with Internet, electronic and media storage

9    services -- devices under the defendant's control.

10        The computer system or devices may be removed for

11   more thorough examination if necessary.

12        The defendant shall contribute to the cost of such

13   monitoring services based on the ability to pay as deemed

14   appropriate by the United States Probation and Pretrial

15   Services Office.

16        And, sir, you should understand that I helped

17   develop all of this information dealing with terrorism.

18   Mr. Engh knows that, and he can tell you that I spent a lot

19   of time and I went to Europe to study, to hire the best

20   people possible so we could develop a program here.  And so

21   my probation office knows how to track you, and if you think

22   you're smarter than me --

23             THE DEFENDANT:  No, sir.

24             THE COURT:  -- God help you.

25             The defendant shall not access Internet-related

1    chats or news groups or participate in any online social

2    environment that includes Facebook, Twitter, Second Life,

3    LinkedIn, Craigslist, FaceTime, WhatsApp, video, audio, et

4    cetera, or texting applications which allow the user

5    interaction unless preapproved and authorized by the

6    probation officer and the Court.

7            And since there's always new apps that are being

8    developed every day, those are included.  And so just

9    because I didn't name them, they're going to be included if

10   they're developed.  And your attorney can come back and

11   argue and say that I didn't include them, but I can tell you

12   he's not going to get very far with that.

13           Defendant shall not submit his person, residence,

14   office -- shall submit his person, residence, office,

15   vehicle or other area under the defendant's control to a

16   search conducted by the United States Probation Officer or

17   supervised designee at a reasonable time and in a reasonable

18   manner based upon reasonable suspicion of contraband or

19   evidence of a supervision violation.  The defendant shall

20   warn any other residents or third parties that the premises

21   and areas under the defendant's control may be subject to

22   searches pursuant to this condition.

23           And one other condition that's not listed is that

24   I want you to go through a program dealing with how to raise

25   a child, how to be a good father, and I want you to

1    successfully complete that program.  Just saying and telling

2    me that you love your daughter is not good enough.  I want

3    to make sure that you have the appropriate skills to do the

4    right thing for her and for you.

5           And finally, there's a $100 special assessment

6    payable to the Crime Victims Fund which is due and payable

7    immediately.

8           The Court will recommend that you be housed in a

9    facility in the State of Minnesota so you'll be close to

10   your family.  Either Sandstone or Duluth would be

11   recommended by the Court, but because of the nature of the

12   charge and conviction, the Bureau of Prisons may send you

13   out of state just because of the nature of the offense that

14   you've pled guilty to.

15          I have no control over what the Bureau of Prisons

16   will do, but I'm making a recommendation that you stay in

17   this state.  And I think other terrorism defendants have

18   stayed in the state, so I'm hoping that you'll be able to do

19   that so you can be close to your family.

20          THE DEFENDANT:  Thank you.

21          THE COURT:  Sir, if you feel the Court has not

22   followed the law in the imposition of your sentence, you

23   have a right to appeal my sentence to the Eighth Circuit

24   Court of Appeals, and that's the appellate court that

25   reviews all of my sentences to make sure that I have

1    followed the law and the Constitution.  You have 14 days

2    from today's date to file that notice of appeal.

3              Mr. Engh will be your attorney on that appeal.  If

4    you do not wish to have Mr. Engh, you can represent yourself

5    or hire your own attorney.

6              But you have 14 days from today's date to file

7    that notice of appeal, giving notice to the Eighth

8    Circuit Court of Appeals that you feel that I have not

9    followed the law or the Constitution in sentencing you here

10   today.

11             Counts 3 and 4, the Government?

12             MR. WINTER:  The Government moves to dismiss the

13   remaining counts in the indictment, Your Honor.

14             THE COURT:  Anything further from the Government?

15             MR. WINTER:  No, Your Honor.  Thank you.

16             THE COURT:  Anything further from probation?

17             MS. HEINO:  Nothing.

18             THE COURT:  Anything further for defense?

19             MR. ENGH:  No, Your Honor.

20             THE COURT:  All right.  Mr. Solomon, please listen

21   to Mr. Engh.  I'm not someone to mess around with.  And just

22   because you're not walking out of here with a 240-month

23   sentence or a 140-month sentence doesn't mean that you're

24   free to do whatever you think you want to do.  That's not

25   going to happen.  And on all my terrorism cases, I'm hands

1    on because I can't have you doing anything that will

2    jeopardize the security of this country or of this state.

3              Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Anything further, Mr. Engh?

6              MR. ENGH:  No, Your Honor.

7              THE COURT:  I missed one condition.

8              The defendant shall participate in mental health

9    counseling program as approved by the probation officer.

10   This program may include psychological and/or psychiatric

11   counseling or treatment, family counseling, or mentor

12   support.

13             You'll work closely with the probation office

14   dealing with this aspect of it because we want to make sure

15   that you clearly understand the nature of your wayward

16   thinking and dealing with the Boogaloo Bois and any other

17   extremist organization.  So you'll work closely with a

18   probation officer on that because we have used psychologists

19   that are experts in their area, so you may have to do that,

20   but that will be determined by the probation office.

21             Do you have any questions?

22             THE DEFENDANT:  No, sir.

23             THE COURT:  We'll adjourn.

24             (Court adjourned at 12:43 p.m.)

25                        *      *      *

1          I, Paula K. Richter, certify that the foregoing is

2    a correct transcript from the record of proceedings in the

3    above-entitled matter.

4

5                    Certified by:   *s/ Paula K. Richter* _____

6                                    Paula K. Richter, RMR-CRR-CRC